# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | 2:17-cr-1690-GMS-1 |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | February 11, 2019 |
| Ryan Patrick Michell, | ) | 3:50 p.m. |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |


BEFORE:  THE HONORABLE G. MURRAY SNOW, CHIEF JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SENTENCING


APPEARANCES:
For the Government:
        U.S. Attorney's Office
        By: KRISTEN BROOK, ESQ.
        40 North Central Avenue, Suite 1200
        Phoenix, AZ  85004

For the Defendant Ryan Patrick Michell:
        Law Office of Mark Francis Willimann
        By: MARK FRANCIS WILLIMANN, ESQ.
        PO Box 40355
        Tucson, AZ  85717

Official Court Reporter:
Charlotte A. Powers, RMR, FCRR, CCR, CSR, CMRS
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 40
Phoenix, Arizona  85003-2151
(602) 322-7250

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

**INDEX OF WITNESSES**

| WITNESSES FOR THE GOVERNMENT: | Direct | Cross | Redirect |
|---|---|---|---|
| DAVID BYRD | 4 | | |

**UNITED STATES DISTRICT COURT**

**P R O C E E D I N G S**

(Proceedings resume at 3:50 p.m.)

MR. WILLIMANN:  Your Honor, may we approach?

COURTROOM DEPUTY:  This is CR17-1690, United States of America versus Ryan Patrick Michell, on for sentencing.

MS. BROOK:  Good afternoon, Your Honor.

Kristen Brook on behalf of the United States.

MR. WILLIMANN:  And good afternoon, Your Honor.

Good afternoon, Ms. Brook.

Mark Willimann with Mr. Ryan Michell, who is here, Your Honor, in custody.

May we approach the podium, sir?

THE COURT:  Well, one moment, Mr. Willimann.  Thanks.

MR. WILLIMANN:  Sure, Judge.

THE COURT:  Please be seated.

I'm informed that the government has a witness they want to call?

MS. BROOK:  Yes, Your Honor, very brief, about a dozen questions for the witness.

THE COURT:  Mr. Willimann?

MR. WILLIMANN:  I object, Your Honor.

THE COURT:  On what basis?

MR. WILLIMANN:  What the government is trying to do is based on my objection --

THE COURT:  On what basis do you object?

DAVID BYRD – DIRECT EXAMINATION                  4

1              MR. WILLIMANN:  It's not relevant.

2              THE COURT:  Well, why don't we wait until we hear what

3      the questions are.

4              Can you clear out -- I'm sorry -- because it's the

5      witness box and...

6              Call your witness, please.

7              MS. BROOK:  Thank you, Your Honor.

8              The government calls ATV Special Agent David Byrd.

9              COURTROOM DEPUTY:  Please step right up here, sir.

10              (DAVID BYRD, Government witness, is sworn.)

11              MS. BROOK:  Your Honor, may I approach briefly just to

12      provide exhibits?

13              THE COURT:  Yes.

14              MS. BROOK:  And for the record, Your Honor, I'm

15      approaching with Exhibit Number 70, which, as it was during

16      trial, has been rendered and made safe.

17                              DIRECT EXAMINATION

18      BY MS. BROOK:

19      Q.  Good afternoon.

20      A.  Afternoon.

21      Q.  For the purposes of the record, will you please introduce

22      yourself to the Court again.

23      A.  My name is David Byrd, B-Y-R-D.  I'm a Special Agent with

24      the ATF here in Phoenix.

25      Q.  And sir, on September 26th of this year, did you testify in

1    this case at trial?

2    A.  Yes, ma'am, I did.

3           MS. BROOK:  And during that time, Your Honor, if I may

4    for the purposes of the record, the witness went through

5    extensively his training and experience just as it pertains

6    to --

7           THE COURT:  You don't need to repeat it.

8           MS. BROOK:  Okay.

9    BY MS. BROOK:

10   Q.  So just one question for you as it relates to your training

11   and experience.

12          Do you have experience identifying and distinguishing

13   characteristics of a semiautomatic weapon, separate and apart

14   from other weapons?

15   A.  Yes, ma'am, I do.

16   Q.  Is that something you do routinely within your daily work

17   and activities with ATF?

18   A.  Yes, ma'am.

19   Q.  If I can direct your attention to Exhibit Number 70 there

20   behind you.

21          MS. BROOK:  Your Honor, this exhibit has already been

22   admitted during trial in this case.

23   BY MS. BROOK:

24   Q.  Do you recognize it?

25   A.  I do.

1   Q.   What is it?

2   A.   It's an SKS rifle.

3   Q.   And --

4   A.   The same one that I rendered my opinion on for this case.

5   Q.   Okay.  Did you do both a Nexus examination of it as well as

6   another opinion later about it, as well?

7   A.   Yes, ma'am, I did.  I test-fired and examined the weapon a

8   separate time.

9           THE COURT:  Do you want to pull the microphone over in

10   front of you, Agent Byrd?

11           THE WITNESS:  Yes, sir.

12   BY MS. BROOK:

13   Q.   Is this the weapon that you originally came into contact

14   with when you went out to Nicholas Riddle's apartment during

15   the early stages of this investigation?

16   A.   Yes, ma'am, it is.

17   Q.   You have before you what's been marked and admitted as

18   Exhibit Number 43.

19   A.   Yes, ma'am.

20   Q.   Do you recognize that?

21   A.   I do.  This is a photograph that was taken of magazines and

22   some ammunition in Mr. Riddle's apartment.

23   Q.   And was that the one time that you were there at that

24   apartment when you were examining Exhibit Number 70 the first

25   time and taking pictures of the magazines?

1   A.  Yes, ma'am.

2   Q.  Are those magazines, do you see them up there with you?

3   A.  Yes, ma'am.  They're included with the exhibit in the box.

4   Q.  So the magazines that are represented there in Exhibit

5   Number 43, are they the same as the ones that are in the box?

6   A.  Yes, they appear to be.

7   Q.  And what similarities do you see between the two?

8   A.  The markings on them.  They're both marked Taptoe U.S.A.

9   There's some markings on the bottom that would be codes from

10  them, and then the general appearance of them is the same as

11  what's been depicted in the picture and what's in the box.

12  Q.  With those magazines, the ones depicted in that picture,

13  the ones contained in the box there, Exhibit 70, have you had

14  an opportunity to determine exactly how many rounds of

15  ammunition fit into each magazine?

16  A.  Yes, ma'am.  I took those property and I loaded them with

17  the proper caliber ammunition 7.62 by 39, and I determined that

18  each magazine would actually hold 21 rounds of ammunition.

19  Q.  So how many magazines are there?

20  A.  There are five.

21  Q.  So each of the five magazines will contain or you could put

22  into them 21 separate rounds of ammunition?

23  A.  Yes, ma'am.

24  Q.  And did you have an opportunity to see whether or not the

25  magazines there in Exhibit 70 can be inserted into the firearm

1   that's in that exhibit with it?

2   A.  Yes, ma'am, I did.  I loaded each magazine with multiple

3   rounds of ammunition, inserted them into the weapon and

4   test-fired each round -- or each magazine numerous times, and

5   they all functioned in this weapon.

6   Q.  You testified earlier during trial about some of the

7   specifics of that particular weapon.  What type of weapon is

8   it?

9   A.  This is a semiautomatic rifle.

10   Q.  And you're talking about the weapon there in Exhibit 70?

11   A.  Yes, ma'am.

12   Q.  How do you know?

13   A.  By its function, by its observation.  There's a gas tube on

14   top which is used to expel the rounds.  Semiautomatic weapons

15   are designed by nature for -- it uses the energy through

16   expending a round to cycle the bolt back, to inject the spent

17   cartridge, to load a new cartridge, and then with a separate

18   trigger pull, to fire another.  They're also referred to as

19   auto-feeding weapons, or semiautomatic rifles.

20   Q.  So to break it down a little more simply there, do you have

21   an opinion about whether or not Exhibit 70, that semiautomatic

22   weapon, has the ability to fire many rounds without reloading?

23   A.  It does.

24   Q.  Did you fire the weapon?

25   A.  I did.

1    Q.  And how did it fire?

2    A.  It functions as intended, as a semiautomatic rifle.

3    Q.  When did you fire it?

4    A.  I don't have my report.  I believe it was last...

5    Q.  And if I may just direct your attention to what's been

6    marked --

7              THE COURT:  Can you let the witness answer the

8    question, please?

9              MS. BROOK:  Sure.

10             THE WITNESS:  Let me check.

11             I tested it on the 6th.

12             THE COURT:  Of what?

13             THE WITNESS:  Of this month.  I'm sorry, Your Honor.

14   BY MS. BROOK:

15   Q.  And you rendered a report?

16   A.  Yes, I did.

17   Q.  And as you mentioned a moment ago, just for clarity, when

18   you test-fired it, did it function normally as you would expect

19   a semiautomatic weapon to fire?

20   A.  Yes, ma'am, it did.

21   Q.  What does that mean exactly?

22   A.  For each depression of the trigger that -- it functioned as

23   it would.  So it cycled a round out -- or ejected a round,

24   cycled it through the action, loaded a fresh round from the

25   magazine, and then on the next trigger pull would fire that

1    round.  And then through firing that round, eject that round

2    and load another round from the magazine as it's intended.

3    Q.  So without need for reloading?

4    A.  Correct.

5         MS. BROOK:  I don't have any other questions, Your

6    Honor.

7         THE COURT:  Thank you.

8         Cross-examination?

9         MR. WILLIMANN:  No, Your Honor.

10        THE COURT:  You may step down.

11        THE WITNESS:  All right.  Thank you, Your Honor.

12        THE COURT:  All right.  You may now approach,

13   Mr. Willimann, with your client.

14        MR. WILLIMANN:  Thank you, Your Honor.

15        THE COURT:  Mr. Michell, good afternoon, sir.

16        THE DEFENDANT:  Good afternoon, sir.

17        THE COURT:  As you know, you were found guilty after a

18   jury trial on the two counts that you were charged with.  After

19   you were found guilty at trial, the United States Probation

20   Department, which is its job, prepared this presentence

21   investigation report.  What it does is it recounts identifying

22   data, data that would identify you; it tells me about the

23   charges and the convictions and what the offense conduct was.

24   Of course, I sat through trial, so I remember much of it.

25        It then assigns a number, and the number is called

UNITED STATES DISTRICT COURT

1    your criminal offense level.  What that number is designed to

2    represent is how serious your crime is with relation to other

3    federal crimes, and it does that by using a number between 1

4    and 43.

5         It then tells me about your criminal history so that

6    it can -- doubtless you've seen the grid whereby a recommended

7    sentence is done by taking the number of the seriousness of

8    your offense, criminal offense level, and coming over and

9    matching it in the column in which your criminal history is

10   found.  So it gives me a summary of your criminal history.

11        And then tells me about your other criminal conduct

12   and arrests, tells me about your personal and family life, your

13   physical, mental, and emotional health, your substance abuse

14   history, and then provides me with sentencing options, what the

15   statute provides, and other matters.

16        As it pertains to you, you have a right to have all of

17   the information in the report be correct.  That's why a copy of

18   the report was given early on to Mr. Willimann with the

19   expectation that he would review the report with you in its

20   entirety and give you a chance to make objections or to seek to

21   obtain corrections in the report.

22        Mr. Willimann has, in fact, filed some -- an objection

23   to the report on your behalf.  I just want to make sure that he

24   has reviewed with you the report in its entirety and that the

25   objection he has filed represents the sum total of the

UNITED STATES DISTRICT COURT

1    objections by the defense.

2              THE DEFENDANT:  Yes, Your Honor.

3              THE COURT:  All right.

4              So Mr. Willimann, I've read the briefing on this.  Do

5    you wish to add anything to it?

6              MR. WILLIMANN:  Yes, Your Honor.

7              What I believe that the government is trying to do,

8    metaphorically speaking, is they're trying to put luggage on

9    the train that has already left the station.

10             Your Honor, the best way, probably, to present this is

11   if we were to do a methamphetamines case, the government would

12   be, at trial, would be obligated to explain to the jury, to

13   have them find beyond a reasonable doubt whether or not the

14   methamphetamine was pure, how many grams were there, because it

15   can go from level 12 all the way to level 38, according to the

16   drug table under U.S.S.G 2D1.1(c) -- well, it's paragraphs 1

17   and paragraphs 15 --

18             THE COURT:  Well --

19             MR. WILLIMANN:   -- are the --

20             THE COURT:  -- I don't want to prevent you,

21   Mr. Willimann --

22             MR. WILLIMANN:  Sure, Judge.

23             THE COURT:   -- from explaining your argument to your

24   client and to his family so they're sure that you're

25   representing them -- their loved one vigorously -- which you

1    certainly are.

2              MR. WILLIMANN:  Thank you, Your Honor.

3              THE COURT:  But aren't you -- aren't you actually

4    making an argument to me that has already been decided --

5              MR. WILLIMANN:  No, sir, it hasn't.

6              THE COURT:  -- and decided against you --

7              MR. WILLIMANN:  No.

8              THE COURT:  -- in terms of the argument that a Federal

9    Sentencing Guidelines are the same thing as a mandatory

10   sentencing statute under a state system?

11             MR. WILLIMANN:  Your Honor, as the Court saw in

12   Alleyne and a couple of other cases, the bottom line is whether

13   or not a factual point as determined by the jury is something

14   that has to be --

15             THE COURT:  Well, again, Mr. Willimann, in those

16   systems -- maybe I'm wrong -- in those systems, it was a

17   mandatory sentencing statute, was it not?

18             MR. WILLIMANN:  Alleyne isn't.  Alleyne is the

19   difference between 1326(b)(1),(b)(2) and whether or not those

20   were crimes of violence, Your Honor.

21             THE COURT:  Right.

22             MR. WILLIMANN:  So I took --

23             THE COURT:  But that is a separate criminal case.

24             MR. WILLIMANN:  But what I'm trying to say is that if

25   there were a drug case, wouldn't the government have to prove

UNITED STATES DISTRICT COURT

1    purity of methamphetamines and the quantity of methamphetamines

2    for the Court to decide what level he falls under?  And the

3    reason for that is because the government gave notice to that.

4            Here what they're trying to do now --

5            THE COURT:  What you're talking about is the capacity

6    of the magazine; correct?

7            MR. WILLIMANN:  Correct.  Capacity of the magazines

8    are not in the indictment, nor did the jury find them to be

9    evidence.

10           THE COURT:  All right.

11           MR. WILLIMANN:  So they're not part of the facts that

12   the jury would normally be determinative of.  So what the

13   government is trying to do --

14           THE COURT:  Let me just --

15           MR. WILLIMANN:  -- my objection --

16           THE COURT:  Let me just say if I may --

17           MR. WILLIMANN:  Sure.

18           THE COURT:  -- are you saying that if the jury in this

19   case did not determine that the magazine had a certain

20   capacity, I cannot use the fact that it did have that certain

21   capacity in calculating what the appropriate guideline range

22   is?

23           MR. WILLIMANN:  That's exactly correct.

24           THE COURT:  All right.

25           MR. WILLIMANN:  And the reason for that --

1          THE COURT:  The objection is overruled.

2          MR. WILLIMANN:  That's fine.  Thank you.  But I was --

3  just to make sure that that is clear --

4          THE COURT:  You have -- you have sufficiently

5  preserved it for appeal.

6          MR. WILLIMANN:  Thank you, Your Honor.

7          Well, then I -- I appreciate the Court mentioning

8  that.

9          May I go forward with the sentencing portion, Your

10 Honor?

11         THE COURT:  You may.

12         MR. WILLIMANN:  Thank you.

13         Your Honor, it has been my distinct pleasure in

14 representing Mr. Michell.  One of the things the Court can

15 consider is the nature in how Mr. Michell committed these

16 offenses.  I want the Court -- and again, I consider you the

17 13th juror.  You heard all the evidence, you sat there and you

18 paid attention, you were -- your rulings were right there.  And

19 at this point, one of the things the Court realized is the two

20 different charges:  One, the four cartridges, the four unspent

21 rounds from the .338 Lapua, were -- were strewn in a garage.

22 They came right from his car.  There was no reason to believe

23 that -- he may have had a knowledge that they were there, but

24 really had no physical intent to break any law.  It just was.

25         Second, the weapon that was at Ryan's brother,

```
1    Mr. Kris Michell's, house, the brothers looked alike.  We
2    understand the jury found him guilty.  We're not going to
3    re-litigate again.  But the -- the evidence was it was a brief
4    period of time that he held that.  And again, he had no desire
5    to control it.  All he just needed to do was transfer it for
6    the -- for the buyer.  So in those limited purposes, I would
7    ask the Court to consider leniency.
8             Finally, Mr. Michell appreciates that whatever the
9    Court does here will be further exacerbated, if you will,
10   because he's got to deal with the matters in state court, as
11   well.  The conviction in this court on Count 1 will -- I'm
12   sorry -- on Count 2 will be a violation of his probation in --
13   in the state court.  So he's looking at a significant amount of
14   time -- could be looking at a significant amount of time in
15   state court.
16            I know the Court doesn't have to consider -- doesn't
17   have to -- to -- well, I guess what I'm trying to say is, you
18   can consider it and it doesn't have to be something that you --
19   is the be all and end all.  But I ask the Court to consider it.
20            Finally, I ask you to consider the children that
21   Mr. Michell has.  He is and was the caretaker of them.  I know
22   the Court has gotten letters from both his mother and his
23   father about who he is.  In this particular case --
24            THE COURT:  Actually, I received a letter from his
25   brother today.  Did you get a copy of that, Mr. Willimann?
```

1      MR. WILLIMANN:  I did not, Your Honor.  I knew it was

2  coming.

3      THE COURT:  Do you want to see that, Ms. Brook?  I

4  read it.

5      MS. BROOK:  I can look at it while this proceeding

6  continues.

7      THE COURT:  All right.

8      Did you -- do you have a copy of it then?

9      MS. BROOK:  I don't.

10     THE COURT:  Do you have a copy of it?

11     MR. WILLIMANN:  I don't.

12     THE COURT:  I will tell you that I read the mother's

13  letter.  I read the father's letter.  I found the brother's

14  letter more persuasive than either one of them, to the extent

15  that it -- that it's persuasive at all.  To the extent that

16  they're asking me to re-litigate what the jury already

17  litigated, I'm not going to do that.

18     MR. WILLIMANN:  Naturally.

19     THE COURT:  But I do think the brother gives a more

20  measured assessment of who the defendant is, more realistic

21  assessment.  So I found that helpful, and just advising you of

22  that, Ms. Brook, in case you want to take a look at it.

23     MR. WILLIMANN:  Ultimately, Your Honor, under 3553,

24  the Court needs to consider a sentence least onerous as

25  possible.  I ask the Court to consider who Mr. Michell is and

1   whether now that he has a -- he suffered the full effects of

2   what has happened to him, whether or not this Court believes

3   that Mr. Michell is going to repeat.  And I'd -- I'd tell the

4   Court he's very smart, and there is no way that he's going to

5   put himself in this situation again, Your Honor.  I'd ask you

6   to --

7           THE COURT:  Smartness sometimes doesn't have much to

8   do with wisdom, Mr. Willimann.

9           MR. WILLIMANN:  You're absolutely right, Your Honor.

10  But I also think that he has the intellectual capacity to -- to

11  choose between one course of conduct and another course of

12  conduct.  And the way our interactions have been, he's never

13  going to put himself into this -- a position again.

14          Finally, the last thing I'm going to say to the Court,

15  the matter back in 1996, I think, had Mr. Michell appreciated

16  the fact that it was still on his record, he would have done

17  everything he could to get that set aside, at least set aside.

18          THE COURT:  Well, and maybe so.  But he certainly

19  appreciated that was on his record when he sold the firearm

20  here.  And I'm not re-litigating it.

21          MR. WILLIMANN:  No, no, no.  I think the thing that he

22  knew was on his record when he sold the firearm, Your Honor,

23  was the 2003 violation date which was convicted of in 2017.  So

24  I think that was the precipitant that made him a felony

25  offender --

1      THE COURT:  Right.

2      MR. WILLIMANN:  -- which is an ag DUI, Judge.  It's

3  not a violent offense.  It was just an ag DUI.  I say "just ag

4  DUI."  They're the bane of societal's existence.  But I just

5  want you to realize it's not a particular heinous as far as

6  violence offenses are concerned.

7      THE COURT:  All right.

8      MR. WILLIMANN:  So I've got nothing more, Your Honor.

9  I do ask the Court to consider a time-served sentence as being

10  reasonable.

11     THE COURT:  Mr. Michell, do you have anything you want

12  to say?

13     THE DEFENDANT:  I do, sir.

14     THE COURT:  Please.

15     THE DEFENDANT:  I know it's been a long day, so I'll

16  try and be as brief as possible.

17     THE COURT:  I'm ready to listen to whatever you have

18  to tell me.

19     THE DEFENDANT:  First I'd like to thank you for your

20  professionalism throughout my proceedings and offering me a

21  fair trial as our great Constitution allows.  So thank you for

22  that, sir.

23     It's obvious I do not agree with, perhaps, the

24  verdict, but I do respect and understand how the jury may have

25  gotten to that decision.

1          Secondly, I would like to ask your consideration, sir,

2    respectfully for that of a probation or something equivalent,

3    as I believe I'd be a strong candidate to be successful on a

4    couple different bases.

5          Post-incarceration, sir, I have completed 32 weeks of

6    programming voluntarily at the CCA facility.  I did provide my

7    attorney, Mr. Willimann, with 11 certificates I hoped you'd be

8    able to review.

9          Further, I am -- I have earned and worked hard on

10   obtaining a rare security clearance at the CCA which I am the

11   senior captain's crew member.  I am one of four trustees for

12   the entire facility of a population of 5,000.  My current risk

13   score is a negative 2 on a scale of zero to 5.  I have had no

14   disciplinary issues whatsoever, and obviously no citations.

15         Post -- I'm sorry -- pre-incarceration, sir, and over

16   the last decade, I've been an entrepreneur in a couple

17   different ventures.  But proudly enough, it's allowed me the

18   opportunity to hire and manage hundreds over that period of

19   time.  Some came to take care of their families, others were

20   there to pay excess bills, some put themselves through college.

21   But I feel I had a positive impact on their lives in one sense

22   or another.

23         Further, I do have a history of charitable work

24   through the New Mexico Roadrunner Food Bank, both in

25   contributions and volunteer work.  So through my establishment,

I did year-round food drives, which I believe we affected the lives of many in the community.  And I'm saying this humbly, sir, and not attempting to gloat, but just to make the point that I am a productive member of society, that I do give back to my community.  And be unbeknownst to some, I am not a threat to the community in general.

I believe I have some vital factors and assets that I'm blessed with now that will help me be successful and re-seed.  They obviously include my supportive, unified, and strong family, sir.  I also have the ability to have consistent, stable housing, consistent and stable employment without the, I guess, reliance on -- on criminal enterprise. And importantly enough too is I have a strong self-ambition to be successful and support my daughters, which are preteens, and they need me more than ever.  And I might add that, you know, being away from them has -- it's been tough on all of us, sir. So...

In conclusion, I just hope you see -- I've prayed that you see this for what it is and what it is not.  And what it is not is this situation never involved any malice or nefarious intent.  In fact, it was at best bad judgment and neglectful mistakes.

I have long been my worst critic in the sense that over the last 14 months, every day, I wake up and I ask myself why I neglected to keep this debris in the corner of my garage.

1    As you've seen the pictures, it was obviously no trophy worth

2    keeping.  I should have -- I should have rid myself of it.  And

3    further, you know, why I didn't take additional steps to steer

4    away from the meeting with Mr. Riddle and my brother so there

5    would be no confusion.

6         I guess what I'm getting at, sir, is I do respect the

7    law.  And that is evident in my past, in my professional life

8    as well.  Every day I dealt with law enforcement, I dealt with

9    regulations, I dealt with health codes, I dealt with ordinances

10   to keep the business going and -- and protect my customers.

11        All I'm really asking for is an opportunity to redeem

12   myself.  And if you allow me this opportunity and that grace, I

13   will not disappoint you, the Court, my family, or myself.

14        That's all, sir.  Thank you for your consideration.

15        THE COURT:  Thank you.

16        Ms. Brook?

17        MS. BROOK:  Thank you, Your Honor.

18        THE COURT:  I will say that the part -- I'll just

19   have -- I'll just tell you what I would like you to address, if

20   you don't mind.

21        MS. BROOK:  Yeah.

22        THE COURT:  I think you're doing your job, the agents

23   are doing their job when they put this in the setting of the

24   original raid and why they raided in terms of the potassium

25   cyanide and everything else.  But it doesn't seem to me that

there's sufficient enough evidence for me to assume in
sentencing that this defendant is a danger because of potassium
cyanide.  I realize that there may well be a risk that he is,
but there isn't any proof that he is, and there isn't
sufficient proof for me to take that into account into
sentencing.

        If I'm left with that, it does seem to me that at best
this defendant suffered from some unfortunate circumstances
that resulted in him being a prohibited possessor, which allows
him now to be charged and convicted of the crimes that he's
convicted of, with little evidence that he is a danger to
society.  And in that sense, I think his brother -- I don't
accept what his brother said, and I think his brother
acknowledged that I wouldn't accept it, about reconsidering the
verdict in this matter.  And I don't reconsider the verdict in
this matter.  I heard the evidence.  I was here.  I think that
the jury arrived at a correct verdict, and one that deserves my
acknowledgment when I sentence somebody.

        What I did think the brother said, which I'm inclined
to consider is, that absent some reason -- or sufficient reason
to believe that this defendant is a danger to society, what we
have here is a defendant who may be smart as a whip, but he's
pretty stupid in some things, and he made some very unwise
choices.  And one of those was, despite what he said here, he
doesn't follow the law.  I mean, I remember very well him

1    firing the .50 -- the film of him firing the .50 caliber.  It

2    wasn't what he was charged with, but it was allowable under

3    404(b) and other matters.  It just seems to me he's pretty

4    casual about his legal requirements under the law.

5            But it does seem to me that that's a little bit of a

6    different consideration than if he had a violent criminal

7    record.  And I realize that his conviction when he was 17, or

8    whatever it was, was concerning.  But he was 17.

9            So, I mean, my best take on it is what I've just told

10   you.  So if you want to address that, I'd be glad to hear what

11   you have to say.

12           MS. BROOK:  Thank you, Your Honor.  If I may.

13           So defendant is well aware through the disclosure that

14   was provided in this case that the facts that underlie his

15   possession of potassium cyanide, or what he believed to be

16   potassium cyanide, as well as his attempted purchase of

17   dimethylmercury, is still under investigation.

18           Defendant is also aware that through the disclosure

19   that came out in this case, we know he has taken out insurance

20   policies on individuals that benefit him to the tune of 10

21   times the amount of the policy those individuals thought were

22   being taken out on them.

23           I say those things only because I want the Court to

24   understand that we do see him to be a danger.  And those facts

25   are predicated not just on him purchasing chemical weapons,

1    attempting to purchase dimethylmercury, but all the other facts

2    that I'm going to touch upon in a moment.

3         And I do want to start with, Your Honor, where this

4    case started, and that was over a month-long period where this

5    defendant on the dark web attempted to purchase chemicals that,

6    if you're going to use them legally, you can buy them legally

7    and you can buy them cheaper.  And he tried to buy potassium

8    cyanide.  His claimed use was goldsmithing, and it does have

9    some applications in that particular context.  But he could not

10   at all, when questioned, articulate the means by which he would

11   use that potassium cyanide to goldsmith, and he said he's never

12   done it before.

13        Dimethylmercury, on the other hand, has no practical

14   applications in a non-lethal context.  A drop of it kills

15   people.  And that was the first thing that he tried to buy on

16   the dark web was the dimethylmercury.

17        So, Your Honor, the government is concerned about him.

18   But I want to talk about some of the other facts inside of his

19   house that are of grave concern.

20        We note through the presentation of testimony in this

21   case that it wasn't just one mistake where the defendant

22   contacted -- or Nicholas Riddle contacted the defendant to

23   purchase this SKS semiautomatic.  We know through Exhibit

24   Number 45, which has been admitted, that it was a lengthy

25   exchange.

1          THE COURT:  Yes, I remember all that.

2          MS. BROOK:  We also know that from the computer

3    evidence, and as was cited in the PSR, in particular in

4    paragraph number 10, that he has photographs on his phone and

5    other devices of other exchanges, times when he was setting up

6    sales of other weapons.  So this isn't just an isolated

7    circumstance.

8          We also know that we had pictures of him, some of

9    which we presented to the jury, of him shooting other

10   semiautomatic rifles, weapons.  The .50 caliber.  And it wasn't

11   just once.  Those were multiple different pictures.  Defense

12   has them, we've talked about them, the PSR hits on them.

13         So this wasn't a situation of one bad choice one bad

14   time.  This defendant has been a felon for 20 years, and for 20

15   years has failed to conform his life and his lifestyle with the

16   confines of his legal predicament, which is that he can't

17   possess weapons.

18         When the agents went into his home on December 1st,

19   they also found a cornucopia of drugs.  They found fentanyl,

20   they found OxyContin, they found methadone, they found

21   steroids, and that all mentioned as well in the PSR; the gas

22   masks, the credit card skimmers.

23         The defendant did talk about being around his

24   children.  I understand that.  And I understand that now

25   perhaps he's wanting to right his life, and I'm very pleased

1  that his family is here to support him in that.  But I also

2  hope that everybody recognizes that this was not just one

3  mistake that the defendant committed.  This is a lifestyle

4  choice.  And he is smart.  When he talks, he's smart.  But he

5  has also been able to finagle his way around the system, and

6  the choices he's making are quite dangerous.

7          The government is concerned under the 3553 factors

8  that the sentence in this case reflect the seriousness of the

9  offense, but also, most importantly protect the community from

10 future offenses of this defendant.

11         He does have multiple other arrests that are not

12 encapsulated in convictions, but show a pattern of fighting and

13 contentiousness.  Also, his ex-wife spoke about him being a

14 sovereign citizen and having that affiliation back in 2003,

15 2004.  And the PSR talked about situations where he was

16 aggressive and fought, paragraphs 42, paragraphs 43, paragraphs

17 48.

18         Your Honor, would you like me to hit upon the

19 semiautomatic?

20         THE COURT:  No.  I mean, you can do what you want, but

21 you don't have to convince me that this was a semiautomatic

22 weapon.

23         MS. BROOK:  Okay.

24         So based upon --

25         THE COURT:  Nor do you have to convince me that the

1    defendant sold it.

2        MS. BROOK:  Yeah.

3        So based upon that particular argument, Your Honor,

4    the government is going to submit on the testimony here and the

5    filings before this Court.

6        Your Honor, this is a defendant who, in the flatbed of

7    his truck, had 50 to 60 spent casings.  So within the range,

8    the range which is applicable to him, an offense level 20,

9    we're looking at 41 to 51 months.  And the government is

10   requesting the 51 months because the offense in this case is

11   not just him on one occasion selling one weapon.  He did also

12   lie about it, and he has not accepted responsibility for it,

13   which does present concern for the government in terms of his

14   reform and acceptance of his circumstance.  But it's also a

15   pattern of behavior with him.  And that pattern recognizes that

16   in the past he has not conformed his lifestyle to his reality.

17   He has flagrantly disavowed the Court and his legal situation

18   for his own convenience to make a buck.  He wasn't working a

19   legitimate job.  He was selling these weapons on the side, and

20   he was doing so for his brother.

21       And I just want to put into context -- or rather with

22   his brother.

23       And I want to put into context for a moment the letter

24   that was supplied from Kris Michell.  Your Honor will remember

25   Exhibit Number 47, which was admitted during trial, which was a

1    text message exchange between Kris Riddle and the defendant,

2    where the defendant said to Kris in early November, hey, leave

3    my handgun out of the safe for me.  I want to come by and get

4    it today.

5              THE COURT:  I remember that.

6              MS. BROOK:  So I just want -- obviously through

7    interviews, Kris Michell knows the defendant is a felon, and

8    that, too, is a felony.

9              So the government would just like everything to be put

10   in context in terms of the opinions that are being offered.

11             With that, Your Honor, the government believes that he

12   is a danger.  We believe that it is imperative to protect the

13   community from him for the nature and circumstance of this

14   offense, to be fully recognized and understand that it was not

15   just a couple rounds of ammunition or one exchange.  The

16   evidence in this case shows that he is a danger, that he has

17   flagrantly disavowed Court orders, he has engaged in that

18   pattern of behavior for decades, and that the sentence in this

19   case should be at the high end to reflect the seriousness of

20   the crime, to promote respect for the law.

21             Thank you, Your Honor.

22             THE COURT:  Thank you.

23             Now, Mr. Michell, when I sentence somebody, I am

24   obliged to follow a sentencing statute.  The sentencing statute

25   requires that I consider the nature and circumstances of your

1    offense, your history and characteristics.  I then have to

2    examine and have your sentence reflect the seriousness of your

3    offense.  I have to have it promote respect for the law and

4    provide a just punishment.  I have to have it be sufficient to

5    deter you from engaging in further criminal conduct.

6            But you're not the only one I'm considering.  I have

7    to have the sentence imposed to deter others from engaging in

8    criminal conduct.

9            I have to consider and promote the protection of the

10   public from further crimes that you might commit.  I have to

11   consider the Federal Sentencing Guideline ranges.  And as

12   Ms. Brook has pointed out in your case, that range recommends a

13   minimum of 41 months' incarceration, with a high-end

14   recommendation of -- let me see here --

15           MR. WILLIMANN:  Fifty-one months, Your Honor.

16           THE COURT:  -- fifty-one months, which the government

17   requests that I impose.

18           I have to consider whether or not you need medical or

19   rehabilitative care.  I have to consider all of those things.

20   And I have to consider how I sentence other people who are

21   similarly situated than you.

22           Let me tell you how I balance all this out.  The

23   Federal Sentencing Guideline ranges suggest a minimum of 41

24   months.  But it has been true that when I've sentenced other

25   people for being prohibited possessors, I have been inclined in

some cases to depart downward because I think that the
sentences are not -- are quite high in those cases where the
defendant has not demonstrated what I would call a considerable
propensity for violence.

The government does point out that you have a
disorderly conduct misdemeanor arrest in the City of Tempe in
2016, and a criminal trespass arrest in the City of Tempe.  I
just don't think that those really in and of themselves
demonstrate much of a propensity for violence.  I do think that
they indicate that you have, in conjunction with your other
convictions, probably an alcohol substance abuse problem.

The government suggests that you're a danger to the
public.  I cannot and do not discount that.  But I do believe
that the government hasn't submitted enough evidence for me to
use it as a significant basis.  Although I will consider it in
determining what I'm going to do with respect to the federal
guideline ranges, I'm not going to consider it a significant
basis on which to enhance your sentence as the government
requests.  If, in fact, you're under an ongoing investigation,
then the government will have time to make whatever charges
it's going to make, and you ought to be smart enough to realize
you're being very closely monitored regardless.

It does seem to me that the evidence against you,
despite what your brother and mother and father say, is pretty
convincing; that you were engaging in the sale of firearms,

1    that you were using firearms in other circumstances.  I can't

2    see any evidence that you were really using them for -- for

3    crimes of violence.  You were selling them, you were target

4    shooting with them, you were doing other things that you're

5    prohibited from doing.  And that in and of itself warrants at

6    least some sentence.  And it seems to me that it warrants some

7    sentence that is augmented a little bit by the fact that I'm

8    just not sure that the public is safe.  But on the other hand,

9    there is no demonstration that you're a significant risk.

10            So where does all that come out?

11            I think 41 months is more than is necessary for the

12   crimes for which you have been convicted on the facts for which

13   you have been convicted.  But I think your -- I think you've

14   demonstrated a cavalier attitude with respect to the law that

15   has caused you to be in the position that you're in.  And that

16   requires some significant punishment.  And if, in the end, the

17   government can make a greater case, then they can bring those

18   charges.  But I am only punishing you for the crimes -- or I am

19   only sentencing you for the crimes for which you have been

20   convicted and the reasonable inferences that can be made from

21   the evidence there.

22            In light of that, I am going to depart downward 11

23   months and give you a 30-month sentence.  I recognize that

24   you've already served a significant part of that, but I would

25   like to see you if -- particularly if you have been -- you've

UNITED STATES DISTRICT COURT

done as well as you've done, and if you can conform your life

to the requirements of your supervised release, which I am also

going to impose, I'd like to not have you be in prison any

longer than you have to be to get the message, and I'd like for

you to be able to come out and serve a productive life and be

with your family.

And it also seems to me that 30 months, to the extent

that you may be a danger to the public, is enough to send you a

message that you better reconsider your behavior.

So pursuant to the Sentencing Reform Act of 1984, it

is the judgment of the Court that Ryan Patrick Michell is

hereby committed to the Bureau of Prisons for an imprisonment

term of 30 months.  This consists of 30 months on Count 1 and

30 months on Count 2, the terms to run concurrently.

The defendant shall pay a special assessment of $200.

The Court finds that the defendant does not have the

ability to pay, and orders that the fine be waived.

The defendant then shall pay a total of $200 in

criminal monetary penalties.

Having assessed the defendant's ability to pay, the

payment of the total criminal monetary penalties is due as

follows:  The balance is due in equal monthly installments of

$25 over a period of eight months, to commence 60 days after

release from imprisonment.

During incarceration, payment of criminal monetary

1    penalties is due at a rate of not less than $25 per quarter.

2    And payment shall be made through the Bureau of Prisons Inmate

3    Financial Responsibility Program.

4           Criminal monetary payments shall be made to the Clerk

5    of the United States District Court, Attention: Finance, Suite

6    130, 401 West Washington Street, SPC1, Phoenix, Arizona,

7    85003-2118.

8           Payment should be credited to the various monetary

9    penalties imposed by the Court in the priority established

10   under 18 United States Code Section 3612(c).

11          The Court hereby waives the imposition of interest and

12   penalties on any unpaid balance.

13          Upon your release from imprisonment, you shall be

14   placed on supervised release for three years.  This term

15   consists of 36 months on Count 1 and 36 months on Count 2, all

16   such terms to run concurrently.

17          While you are on supervised release, you shall comply

18   with the mandatory and standard conditions of supervision as

19   adopted by this Court in its General Order 17-18.  Of

20   particular importance, you shall not commit another federal,

21   state, or local crime during the term of your supervision.

22          Within 72 hours of sentencing or release from the

23   custody of the Bureau of Prisons, you shall report in person to

24   the probation office in the district to which you were

25   released, if you are not deported.

1    You shall comply with the following special

2    conditions:  You must provide the probation officer with access

3    to any requested financial information, and authorize the

4    release of any financial information.  The probation office may

5    share financial information with the United States Attorney's

6    Office.

7    You must cooperate in the collection of DNA as

8    directed by the probation officer.

9    You must submit your person, property, house,

10   residence, vehicle, papers, or office to a search conducted by

11   a probation officer.  Failure to submit to a search may be

12   grounds of revocation of release.

13   You must warn any other occupants that the premises

14   may be subject to searches pursuant to this condition.

15   You must participate as instructed by the probation

16   officer in a program of substance abuse treatment, outpatient

17   and/or inpatient, which may include testing for substance

18   abuse.  You must contribute to the cost of treatment in an

19   amount to be determined by the probation officer.

20   You must not use or possess alcohol or alcoholic

21   beverages.

22   You must submit to substance abuse testing.

23   You must not attempt to obstruct or tamper with the

24   testing methods.

25   You must contribute to the cost of testing in an

1    amount to be determined by the probation officer.

2           Your interest in the following property shall be

3    forfeited to the United States:  Four rounds of Lapua .338

4    caliber ammunition.

5           Do you understand the sentence as I have imposed it

6    upon you, sir?

7           THE DEFENDANT:  Yes, Your Honor.

8           THE COURT:  You have maintained the right to appeal

9    that sentence.  And as you've maintained that right, you have

10   also maintained the right to apply for leave to appeal in forma

11   pauperis.  If you do that, the Clerk of the Court will prepare

12   and file a Notice of Appeal on your behalf.  But with few

13   exceptions, any such notice must be filed within 14 days of

14   today's judgment.

15          Do you understand that, sir?

16          THE DEFENDANT:  Yes, Your Honor.

17          THE COURT:  Anything else on behalf of your client,

18   Mr. Willimann?

19          MR. WILLIMANN:  Just one thing, Your Honor.  I just

20   want the Court to clarify, what -- what should happen with the

21   Court's probation and post-convict -- post-detention should he

22   be detained in state court, subsequent to this Court's sentence

23   here?

24          THE COURT:  That's up to the state court to determine.

25   I've imposed the federal sentence.

1      MR. WILLIMANN:  I understand.  But, Your Honor, the

2  three years' probation would start after, I guess, he's out of

3  state custody.  Would that be a fair to say, Your Honor?

4      THE COURT:  I am not going to make any pronouncements

5  on that because I'm going to wait and see what the state court

6  does.  If you want to bring -- raise a matter for me for my

7  reconsideration --

8      MR. WILLIMANN:  That would be great.

9      THE COURT:  -- after the state court does what the

10 state court does, then you may do so.

11     MR. WILLIMANN:  Thank you, Your Honor.  Appreciate it.

12     May I be excused, Your Honor?

13     THE COURT:  I'm sorry?

14     MR. WILLIMANN:  May I be excused?

15     THE COURT:  Yes.

16     MR. WILLIMANN:  Thank you.

17     THE COURT:  Anything else behalf of the government?

18     MS. BROOK:  No, Your Honor.

19     Thank you.

20     THE COURT:  Thank you.

21         (Proceedings in recess at 4:37 p.m.)

22

23

24

25

1          <u>C E R T I F I C A T E</u>

2

3          I, CHARLOTTE A. POWERS, do hereby certify that I am

4  duly appointed and qualified to act as Official Court Reporter

5  for the United States District Court for the District of

6  Arizona.

7          I FURTHER CERTIFY that the foregoing pages constitute

8  a full, true, and accurate transcript of all of that portion of

9  the proceedings contained herein, had in the above-entitled

10  cause on the date specified therein, and that said transcript

11  was prepared under my direction and control.

12          DATED at Phoenix, Arizona, this 9th day of July, 2019.

13

14                              <u>s/Charlotte A. Powers</u>
                            Charlotte A. Powers, RMR, FCRR
15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**